# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| River Ridge Development Authority | ) ASBCA No. 58981 |
| | ) |
| Under Contract No. DACA27-1-02-477 | ) |

APPEARANCES FOR THE APPELLANT: Barry P. Steinberg, Esq.
Joseph L. Fuller, Esq.
  Kutak Rock, LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
  Engineer Chief Trial Attorney
Tarrah M. Beavin, Esq.
Lisa M. Patrick Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Louisville

## OPINION BY ADMINISTRATIVE JUDGE CLARKE

The Indiana Army Ammunition Plant was leased to the River Ridge Development Authority (RRDA) for the ultimate purpose of transferring the property to the State of Indiana. The lease provided that certain costs could be offset as a credit against the fair market rental each year. RRDA disputes the Army's "disallowance" of certain costs as credits. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The parties chose to submit the case on the record pursuant to Board Rule 11. We decide entitlement only. We sustain the appeal in part.

## FINDINGS OF FACT

1. In 1992 the Army placed the Indiana Army Ammunition Plant in Charlestown, Indiana (INAAP), into caretaker status after over 40 years of INAAP producing, storing, and bagging reactive material, including smokeless powder, black powder, and powder charges for cannons and mortars (stip. ¶ 1).[1]

2. The State of Indiana recognized the INAAP Reuse Authority (RA) as an authorized local reuse authority in accordance with Indiana Code, Title 36, Article 7,

---

[1] The parties entered into a joint stipulation of fact (stip.) dated 22 August 2014.

Chapter 30, *et seq.* INAAP Reuse Authority changed its name on 14 April 2004 to the River Ridge Development Authority (appellant).[2] (Stip. ¶ 5)

3. Public Law (Pub. L.) No. 105-261, section 2843, authorized the Army to convey approximately 4,660 acres of INAAP to RRDA for purposes of developing an industrial park, which the Army designated parcel 1 and later confirmed the acreage of parcel 1 to be approximately 4,390 acres (stip. ¶ 6). Parcel 2, consisting of approximately 1,514 acres was claimed by RRDA during state and local screening of federal excess property. Pub. L. No. 105-261, section 2843, does not authorize the Army to include an indemnification clause in the contract conveying INAAP to RRDA. 112 Stat. 2217-18.

4. On 30 October 2000, the Army and RRDA entered into a Memorandum of Agreement (MOA) for the transfer of the Indiana Army Ammunition Plant and Interim Lease No. DACA27-1-00-037 (Interim Lease) (stip. ¶ 8; R4, tab 2 at 11[3]; supp. R4, tab Q at 31).

*The MOA*

5. The MOA declared that the INAAP was excess to the needs of the Army and that parcels 1 and 2 (The Property) would be "transferred" to RRDA as provided in the MOA (stip. ¶ 9; R4, tab 2 at 11-12). Section 2.05 reads in part:

> The Reuse Authority shall pay all expenses for surveys; title insurance costs; real estate transfer taxes, if any; recording fees; and all other reasonable costs/expenses associated with the transfer/conveyance of The Property and personality [sic]. This MOA will be an exhibit to the lease.

(R4, tab 2 at 15)

6. Section 3.02 of the MOA states in part:

> The Army shall remain responsible for all losses and damages to The Property by fire, wind storm, casualty, or other cause, and for liabilities that may arise due to the activities of the Army's officers, agents, and employees, occurring on The Property or related thereto and prior to leasing or conveyance of The Property to the Reuse Authority and subject to the terms of the Interim Lease.

---

[2] While the name change was not effective until 14 April 2004, we will refer hereinafter to the INAAP RA as RRDA.

[3] Page numbers in Rule 4 file citations are to the consecutively-stamped numbers.

This provision applies only to the extent that the loss, damage, or liability is not attributable to the activities of the Reuse Authority or its officers, employees, agents, contractors, licensees, or sublessees prior to or during the lease term. Notwithstanding the foregoing, the Army shall have no obligation to repair, replace or demolish property damaged or destroyed prior to transfer, but the Army shall take reasonably appropriate measures to ensure that the portion of The Property upon which the buildings or structures are located is rendered safe in accordance with applicable Federal regulations.

(Stip. ¶ 12; R4, tab 2 at 15-16)

7. Section 3.03 C. of the MOA states in part:

The Reuse Authority shall indemnify and hold the Army harmless from all claims, liability, loss, cost, or damage that may occur as a result of the Reuse Authority's undertakings under this Section 3.03, except where such claims, liability, loss, cost, or damage is the result of:

(1) the negligence or misconduct of the Army or its employees, agents, or contractors; or

(2) the existence of any hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative on The Property, or portion thereof, prior to the leasing of such Property by the Reuse Authority, to the extent that the Reuse Authority has not contributed to the release of said hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative.

(Stip. ¶ 13; R4, tab 2 at 17)

8. Section 4.01 of the MOA states in part:

For and in consideration of the leasing of The Property, to include the personal property, the Reuse Authority agrees to the following terms and conditions:

A. Provide O&M [Operations and Maintenance] for the entire installation.... The O&M expenditures will be considered as offsets to Fair Market Rental (FMR).

(Stip. ¶ 14; R4, tab 2 at 18)

9. Section 6.03 of the MOA states in part:

The Army agrees to complete the environmental cleanup of the Property and provide the applicable warranties and covenants as required by Section 120(h) of CERCLA and other applicable law and regulation, subject to the availability of appropriated funds.... The Reuse Authority or any successor, assignee, transferee, lender, contractor or lessee of the Reuse Authority or its successors or assigns, shall have no obligation to fund, participate in, or complete the cleanup of existing hazardous substances, pollutants or contamination ("Existing Contamination") on or adjacent to The Property....

(Stip. ¶ 15; R4, tab 2 at 22)

10. Section 6.07 of the MOA states:

The Reuse Authority acknowledges receipt of and has reviewed and carefully inspected the Environmental Baseline [Study] ("EBS") for the Property dated August 1998 and November 1998.

(Stip. ¶ 16; R4, tab 2 at 23)

*The Environmental Baseline Study (EBS)*

11. The EBS documented the results of a study of all current and past tenant-leased properties within the boundaries of INAAP. The stated purpose was to "document whether or not hazardous substances were stored, used, released, and/or disposed on INAAP property by current or past Facility-Use tenants" (supp. R4, tab B at 1-1). The EBS grouped the properties into three classes

Class I:    Locations/tenants where little or no potential exists for environmental contamination (office space, warehousing and storage facilities).

4

Class II: Locations/tenants where some potential exists for environmental contamination (machine shops, manufacturing, chemical storage).

Class III: Locations/tenants where high potential exists for environmental contamination or with known environmental contamination situations (tank farms, scrap metal operations).

(*Id.*) The EBS included maps, narrative descriptions for each location/tenant and pictures (supp. R4, tab B).

*The Interim Lease[4]*

12. The Interim Lease stated the fair rental value of The Property at the time of execution of the Interim Lease was $1,594,424 and that the projected cost of operation and maintenance required by the Army's Operations and Maintenance Plan (O&M Plan) was $1,889,438. The Interim Lease states that the "Secretary agrees that all documented costs, which are directly related to improvement, operation, maintenance, protection and repair, as described in Exhibit D[5], will be applied as an offset to the fair rental due to the Lessor under this Lease." (Stip. ¶ 18; supp. R4, tab Q at 4-5, ¶ 3.a., c., d.)

13. Interim Lease Condition 14, "HOLD HARMLESS AND INDEMNITY," provides that the Lessee assumed "all risks of loss or damage to property and injury or death to persons" resulting from the condition of the leased premises or its possession or use by Lessee (supp. R4, tab Q at 11-12). Lessee waives all claims against Lessor and indemnifies and holds harmless the Lessor from any liabilities resulting from Lessee's possession and/or use of the leased premises (*id.*). Condition 14 does not include a clause providing indemnity from the Lessor to the Lessee for release of hazardous material.

*The Master Lease*

14. The Master Lease, No. DACA27-1-02-477, dated 2 May 2003, replaced the Interim Lease and extended the relationship between the Army and RRDA for 25 years until 2028. The Master Lease was signed by Mr. Dan James, President, INAAP Reuse Authority, on 23 April 2003 and by Mr. Joseph Whitaker, Deputy Assistant Secretary of the Army on 2 May 2003. (R4, tab 3 at 70) In the preamble the Master Lease recited, "Public Law 105-261, Section 2843 authorized the Secretary of the Army to convey approximately 4,660 acres of INAAP (Exhibit A) to the INAAP Reuse Authority for the

---

[4] We do not go into great detail of what is in the Interim Lease because most of what is in the Interim Lease is also in the Master Lease (*see* findings 14-27).

[5] Exhibit D is the O&M Plan (R4, tab 4).

5

purpose of developing an industrial park to replace all or part of the economic activity lost at the inactivated plant" (R4, tab 3 at 33). The Army agreed to lease The Property and RRDA agreed to perform the requirements of the Army O&M Plan in exchange for offsetting the costs against the Fair Rental Value of The Property, which was stated in the Master Lease to be $1,723,998, based on government appraisals dated 14 July 1999 and 16 August 1999 (stip. ¶ 20; R4, tab 3 at 34-36).

15. Condition 3.b. of the Master Lease states in part:

> As consideration for the Lease, Lessee agrees to assume responsibility for the care, custody, maintenance, repair, and protection obligations of the Lessee (safety, security including Force Protection, and fire protection including HAZMAT), as outlined in Exhibit D, Army Operation and Maintenance (O&M) Plan.

(Stip. ¶ 21; R4, tab 3 at 35)

16. Condition 3.c. of the Master Lease states that RRDA may accomplish environmental restoration projects with the prior written approval of the Army "as consideration under this Lease up to the appraised value of the annual leasehold interest" (stip. ¶ 40; R4, tab 3 at 36). Condition 3.d. states:

> As portions of the Leased Premises are conveyed to the Lessee, the conveyed property will be deleted from the Leased Premises and the O&M requirements under Exhibit D [O&M Plan] will be adjusted accordingly.

(Stip. ¶ 27; R4, tab 3 at 36)

17. Condition 3.f. of the Master Lease contemplates an annual accounting of appellant's receipts for subleases on The Property and expenditures related to performing the requirements of the O&M Plan. The Master Lease provides that RRDA will submit "detailed documentation certified by an independent Certified Public Accountant, describing receipts and expenditures related to the Lessee's requirements as outlined in Exhibit D,"[6] and that the Army will evaluate that documentation. The Master Lease indicates that upon completion of the Army's review, the Army will determine

---

[6] As near as we can determine, this phrase is the sole criteria contained in the Master Lease for determining whether the costs at issue are properly includable as credits for appellant pursuant to this accounting. Thus, to be eligible, a documented cost must be related to RRDA's responsibilities under the "O&M Plan (exh. D)."

6

"additional consideration due, if any, to satisfy the annual Fair Market Value requirements" (offset) and if appellant's expenditures exceed the Fair Market Value rent, the Army and RRDA agree that the expenditures would be carried over to the subsequent years and continue to carry over until such time as all expenditures have been applied to consideration due or subsequent purchase of The Property. (R4, tab 3 at 36-37)

18. Condition 3.g. provides:

> It is understood that taxes, insurance and common area maintenance are the Lessee's responsibility and will not be considered as valid consideration during the annual accounting period. However, for those existing tenants described in Condition No. 3.a., any verifiable costs of taxes, insurance and common area maintenance and any other offsets agreed to by the Lessee and the District Engineer, which are directly or indirectly (pro-rata share) attributable to the existing tenants, will be considered allowable offsets, as described in Condition No. 3.b.

(R4, tab 3 at 37)

19. Condition 8 of the Master Lease states in part:

> Except as otherwise provided in this Lease and except for (1) the environmental condition of the Leased Premises as reflected in the Environmental Baseline [Study's] (EBS's) dated August 1998, and November 1998, prepared by Plexus Scientific Corporation, attached hereto and made a part hereof as Exhibit E; and (2) obligations imposed under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601 et seq., hereinafter ("CERCLA"), the Leased Premises, including all improvements located thereon, is leased "AS IS" and "WHERE IS" without representation, warranty, or guaranty by the Lessor as to the quantity, quality, character, title, condition, size or kind, or that the same is in condition or fit to be used for the purpose for which intended, and no claim for allowance or deduction upon such grounds will be considered unless the damage under such claim is the result of an act or omission of the Lessor or an agent of the Lessor....

(Stip. ¶ 31; R4, tab 3 at 38)

7

20. Condition 11, "PROTECTION OF PROPERTY," provides that RRDA "shall keep the premises in good order and in a clean, safe condition by and at the expense of the Lessee" and assume responsibility for any damage caused by Lessee's or its sublessee's activities on INAAP (R4, tab 3 at 41). "The Lessor shall be responsible only for any damages to property, which occurs due to the Lessor's activities" (*id.*).

21. Condition 12, "INSURANCE," subparagraph a. provides that the Lessee shall obtain comprehensive liability insurance in the amount of no less than $1,500,000 for "bodily injuries or death resulting therefrom, property damage, or both...resulting from the operations of the Lessee under the terms of this Lease" (R4, tab 3 at 41). Subparagraph 12.f. reads, "Environmental protection is addressed in Condition No. 21, **CERCLA REMEDIATION, ARMY LIABILITY AND ENVIRONMENTAL PROTECTION**" (*id.* at 43).

22. Condition 14, "HOLD HARMLESS AND INDEMNITY," provides that except as otherwise expressly provided in the Master Lease, Condition 14.b. provides that RRDA assumes "all risks of loss or damages to property or injuries or death to persons which may arise from or be attributable or incident to the condition or state of repair of the Leased Premises after the commencement date of the [Master Lease], or [appellant's] possession and/or use and occupation of the Leased Premises, or [appellant's] operations conducted under this Lease" (stip. ¶ 35; R4, tab 3 at 44). Per Condition 14.d., this hold harmless and indemnification does not apply to damages, claims, suits, liabilities, judgments, costs, expenses and attorney's fees resulting from the negligence or willful misconduct of the Army or its officials, officers, agents, employees or contractors; from activities undertaken by the Army in relation to environmental remediation of the property; or from the Army's activities on the property for which the Army would otherwise be responsible (*id.*).

23. Condition 14.e. of the Master Lease states:

> The Lessor recognizes and agrees, as set forth in by [sic] Section 330 of Public Law 102-484,[7]as amended, to hold

---

7 SEC. 330, INDEMNIFICATION OF TRANSFEREES OF CLOSING DEFENSE PROPERTY.

(a) IN GENERAL.—(1) Except as provided in paragraph (3) and subject to subsection (b), the Secretary of Defense shall hold harmless, defend, and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any

8

harmless, defend, and indemnify in full [appellant] and its employees, agents, contractors, subcontractors, Lessees, sub-lessees, transferees, successors and assigns from and against any suit, claim, demand or administrative or judicial action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative as a result of the Lessor's activities on the Property. This indemnification does not apply to the extent there is a release or threatened release which Lessee, its employees, agents, contractors, subcontractors, Lessees, sub-lessees, transferees, successors and assigns caused or contributed to....

(Stip. ¶ 36; R4, tab 3 at 44-45) The parties stipulated that the Army's position on the Section 330 Indemnity Provision (Condition 14.e.) is that since the property was not closed pursuant to a base closure law, it was ultra vires and invalid as a matter of law (stip. ¶ 37). The Army has admitted that sometime between May 2003 and June 2004 the Army informed appellant that it would not honor Condition 14.e. (app'x to app. Rule 11 br., answer to interrogatory No. 8). No deeds transferring The Property contain any reference to this "Section 330 Indemnity" (stip. ¶ 38).

24. The record includes an affidavit from Mr. Elliott (app. br., appx. 1). Mr. Elliott was the Executive Director of RRDA and primary negotiator during the negotiations with the Army for the Interim Lease and Master Lease (*id.* ¶ 6). "RRDA's potential liability for environmental issues on The Property was of particular concern to RRDA and the Army" (*id.* ¶ 8). Mr. Elliott recalled that RRDA "pushed for stronger environmental protection by the Army for the portion of the ammunition plant we were negotiating to receive" (*id.* ¶ 10). In paragraph 11, he recalled that they "insisted that the Master Lease include an environmental indemnity in light of all of the concerns that arose during the Interim Lease. According to Mr. Elliott RRDA wanted an environmental

---

claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance or pollutant or contaminant as a result of Department of Defense activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.

9

indemnity and Condition 14.e. was included in the Master Lease after RRDA requested it and the Army agreed to insert it." (*Id.* ¶ 11) Mr. Elliott believed that the State of Indiana had received the indemnity protection of a provision like 14.e. in the documents concerning another transfer of property (*id.* ¶ 11). Mr. Elliott's affidavit establishes that RRDA would not have entered into the Master Lease without Condition 14.e. (*id.* ¶ 13).

25. In its reply brief the Army included an affidavit by Mr. Dupaquier who participated in the negotiation of the Interim and Master Lease with RRDA on behalf of the Army (gov't reply br., attach. 1). Mr. Dupaquier responded to Mr. Elliott's affidavit. Concerning paragraph 11 of Mr. Elliott's affidavit, he disagreed that the Army provided indemnification to the State of Indiana but was silent as to Mr. Elliott's assertion that RRDA insisted that indemnification be added to the Master Lease and the Army agreed to add paragraph 14.e. (*id.* ¶ 3.c.). Thus, we find as fact that during negotiations of the Master Lease, RRDA and the Army had a "meeting of the minds" that the Army would provide environmental hazard indemnification for RRDA, and the parties agreed on Condition 14.e.

26. Condition 21, "CERCLA REMEDIATION, ARMY LIABILITY AND ENVIRONMENTAL PROTECTION," notifies appellant:

> a. Pursuant to Sections 120(h) (1) of CERCLA, as amended, 42 U.S.C. Section 9629 (h) (1), Lessor hereby notifies Lessee that: (1) hazardous substances were stored, released, and disposed on the Leased Premises so as to exceed the time period or quantity limits established by 40 CFR Part 373 for notification (for the purpose of this Lease, "hazardous substances" shall have the same meaning as section 101(14) of CERCLA); (2) available information regarding the type, quantity, and location of such substances and actions taken is at Exhibit J, attached hereto and incorporated herein; (3) except as indicated by this table at Exhibit J, there is no evidence indicating that hazardous substances were released on site.

> b. Lessor hereby notifies Lessee that the white areas inside the heavy black lines depicted on Exhibit K are Category 1 properties as set forth in the EBS attached hereto as Exhibit E. Category 1 properties are those properties where no release or disposal of hazardous substances has occurred, including migration of these substances from adjacent areas.

> c. With regard to the Categories 2 through 7[8] properties that are subject to this Lease and also shown on Exhibit K[9], the Lessor assumes responsibility to take all response actions, consistent with the planned future use of the Leased Premises as a commercial or industrial park, that are necessary to protect human health and the environment with respect to any such hazardous substances existing on the Leased Premises as a result of the Lessor's or its contractors' prior use....
>
> ....
>
> e. Except as otherwise provided by law, including, but not limited to CERCLA, the Lessor shall not incur liability for additional response action or corrective action found to be necessary after the date of lease unless the storage, release, or disposal of any hazardous substances were due to Lessor's activities, ownership, use, or occupation of the Leased Premises, or the activities of Lessor's contractors, and/or agents.

(R4, tab 3 at 49-51)

27. Condition 37.c., "PROPERTY MANAGEMENT PLAN," of the Master Lease states that RRDA may accomplish environmental restoration projects "as offsets, not to exceed the Fair Market Value of the property, and to help accelerate development of the industrial park and property conveyance" (stip. ¶ 40; R4, tab 3 at 66-67).

*The O&M Plan*

28. The Army's O&M Plan, included as exhibit D to the Master Lease, describes the tasks and services developed by the Army for RRDA to fulfill the Army's responsibility to preserve and protect The Property while in the ownership of the Army. Paragraph I, Purpose of the O&M Plan states, in part:

> The purpose of this O&M Plan is to provide the surveillance and protection requirements to the facility to protect the Army's interests and liability. This document

---

8 The EBS does not have "Categories 2 through 7," it has "Class I, II, and III" (supp. R4, tab B at 1-1). There is no explanation for this in the record.

9 Exhibit K is a map with seven categories but does not define the categories and is largely illegible (supp. R4, tab E).

identifies the general requirements of maintenance services required at INAAP. Only minimal fire protection, road and grounds, real and personal property maintenance measures are required in addition to safety, security and environmental compliance to protect the Army's liability and interests until the facility is transferred.

(Stip. ¶ 26; R4, tab 4 at 72)

29. Section D, "SECURITY," of the O&M Plan designates The Property as a restricted controlled area and requires RRDA to provide all physical safety and security for the leased premises 24 hours a day, 7 days a week (stip. ¶ 29; R4, tab 4 at 76).

30. Section E, "ENVIRONMENTAL," of the O&M Plan includes detailed requirements related to appellant's environmental oversight and management of The Property on behalf of the Army including hazardous waste management, permitting, reporting, training, and payment of fees to ensure compliance with various environmental laws (stip. ¶ 30; R4, tab 4 at 79). The O&M Plan requires RRDA to "conduct an environmental program which shall include, but is not limited to, establishing, developing, and implementing policies, objectives, priorities, procedures, and assigning responsibility for complying with an Environmental Quality Program which is designed to effectively and efficiently manage and control environmental pollution" (stip. ¶ 30; R4, tab 4 at 80, ¶ 2.1.). Section E also contains the following:

2.2. INAAP RA will identify, locate, and document all INAAP environmental problems associated within the INAAP RA's operations. The INAAP RA will establish plans in accordance with and comply with all applicable Federal, state, and local environmental laws, regulations, and executive orders. INAAP RA will comply with all applicable Department of the Army policies as set forth in AR 200-1 and AR 200-1 and supplements.

2.3. INAAP RA will provide appropriate administrative and technical support to the District Engineer, Commander's Representative, Federal, State or local regulatory agency in conducting specific or multi-media audits, inspections and/or surveys. INAAP RA will correct and/or respond to any violations or deficiencies cited and/or identified by the District Engineer, Commander's Representative, and/or Federal, State or local regulatory agencies during planned and/or unplanned inspections. Corrective actions will be coordinated with

12

the District Engineer and Commander's Representative. The INAAP RA shall be responsible for the payment of any and all fines, penalties and costs resulting from actions or inaction by themselves and their tenants.

.....

2.5. INAAP RA shall provide to the Commander's Representative through the District Engineer, all information needed to initiate budgeting documents required to prepare the Army's Environmental Program Requirements Report (See Attachment 3). This will include information to correct existing or potential violations of Federal, State, or local environmental laws, regulations, Army regulations, and Executive Orders. The Army will seek funding to correct identified deficiencies outside the terms of the O&M Plan. Unless specifically directed by the leasing officer, use of facilities shall be at the discretion of the lessee. The correction of deficiencies will be funded by the Army on a case-by-case basis, subject to the availability of funds.

(R4, tab 4 at 80-81)

31. On 27 August 2004, RRDA sent a letter to William Birney, then Deputy Assistant Secretary of the Army, that requested an amendment to the Master Lease that "protects the Development Authority from all costs, losses, and expenses which arise from or are related to environmental conditions of the property which existed prior to conveyance of title" and suggested that these protections be accomplished by providing a credit against the purchase price for conveyed property for expenses that occur within ten years of conveyance of title. RRDA stated in the letter its position that:

The need for this protection became apparent after the recent episode between the Army and Chryso (a tenant). In this situation, the Army leased property to Chryso in 1994 and ordered the company to cease operations in 2003 after it concluded some of the leased premises might be contaminated. An effort was made by the Army to associate [appellant] with liability for damages during this incident. Therefore, it is both justified and necessary that any such costs, losses, or damages be deducted from the purchase price if they occur.

13

(Stip. ¶ 47; supp. R4, tab R at 2) RRDA also requested that credits against acquisition costs be provided for "the costs of environmental risk insurance to protect against adverse environmental conditions not known to the Army or Development Authority at the time of the Master Lease" (*id.* at 3).

32. The Army, through the then-new Deputy Assistant Secretary of the Army, Joseph W. Whitaker, responded to appellant's letter of 27 August 2004 by letter dated 27 October 2004, stating in relevant part:

> 3. Provide Further Protection Against Losses from Environmental Conditions—
>
> You requested that the Army provide a credit against the purchase price for all costs, losses, and expenses related to pre-transfer environmental conditions that occur within ten years after conveyance of title. Prior to transferring property, the Army is required to complete all remedial action necessary to protect human health and the environment. In addition, the Army will provide a covenant to perform additional remediation found to be necessary after the date of transfer. If there are personal injury or property damage claims as a result of pre-transfer environmental or explosive-safety conditions, Army liability would be determined in accordance with the Federal Tort Claims Act or other applicable law. Therefore, the Army will not provide the RRDA an "environmental conditions" credit.
>
> ....
>
> F. Regarding environmental risk insurance, please review Condition No. 21, CERCLA Remediation, Army Liability and Environmental Protection of the Master Lease. Prior to transferring property, the Army is required to complete all remedial action necessary to protect human health and the environment. In addition, the Army will provide a covenant to perform additional remediation found to be necessary after the date of transfer; therefore environmental risk insurance is not an allowable expense.

(Stip. ¶ 48; supp. R4, tab S)

33. RRDA responded to the Army's 27 October 2004 letter with a letter dated 1 November 2004, which included the following regarding environment liability and environmental insurance:

> 3. <u>Protection from Losses for Environmental Conditions</u>— We know the Army is liable for damages caused by the environmental conditions it created. We became concerned that the Army may be attempting to avoid its responsibilities for such liability as we observed its actions relative to Chryso (a tenant). This is why we are somewhat skeptical about the Army's follow through on meeting its environmental responsibilities and additional protection is being sought. We will withhold our judgment until we see how the Army resolves the Chryso issue. We may continue to ask for more protection if we are not satisfied with the Army's disposition of the Chryso matter.
>
> ....
>
> Further, the Master Lease provides that we be covered by liability insurance in an amount not less than that which is "prudent, reasonable, and consistent with sound business practices." Therefore, we conclude that no prudent business would accept title to an ammunition plant without environmental liability insurance and that the payment for such insurance is an allowed expense under the terms of the Master Lease.

(Stip. ¶ 49; supp. R4, tab T at 1-2)

34. The Army responded to Appellant's 1 November 2004 letter with a letter dated 14 January 2005, which restated the Army's previous response regarding environmental liability as follows: "If there are personal injury or property damage claims as a result of pre-transfer environmental or explosive safety conditions, then Army liability would be determined in accordance with the Federal Tort Claims Act or other applicable law." With respect to environmental insurance, the letter referenced paragraph F of the Army's 27 October 2004 letter. (Stip. ¶ 50; supp. R4, tab U at 1)

*RRDA Purchases Environmental Hazard Insurance*

35. After concluding that environmental insurance was RRDA's only remaining alternative to mitigate the risks it was now facing, on or about September 2003, RRDA hired an environmental insurance broker to assist in the purchase of an

environmental liability insurance policy. RRDA purchased a policy from Zurich Environmental with an effective date of 29 April 2005 and a ten-year term of coverage for pre-existing unknown environmental conditions including munitions and explosives of concern (MEC), unexploded ordnance, and concussive risk. (Stip. ¶ 51; supp. R4, tab W; app. br., app'x 1, Elliott aff. ¶¶ 15-19_)

36. Policy No. REL 9028576-00 provided $25,000,000 liability for three areas of coverage:

COVERAGE A: FIRST PARTY CLEANUP DISCOVERY

We will pay on behalf of an "insured" any "cleanup costs" required by "government authority" as a result of a "pollution event" on, at or under a "covered location" that is first discovered by the "insured" during the "policy period", provided that the "claim" is reported to us in writing during the "policy period", or any applicable extended reporting period. Coverage for "claim(s)" due to changes in "governmental authority" during any applicable extended reporting period is set out in EXTENDED REPORTING PERIODS (Section V.).

COVERAGE B: THIRD PARTY POLLUTION LIABILITY

We will pay on behalf of an "insured" any "loss" caused by a "pollution event" on, at, under or coming from a "covered location" that an "insured" is legally obligated to pay as a result of a "claim" first made against the "insured" during the "policy period", provided that the "claim" is reported to us, in writing, during the "policy period", or any applicable extended reporting period.

....

COVERAGE C: MEC LOSS LIABILITY

We will pay on behalf of an "insured" any "MEC loss" caused by "munitions and explosives of concern" present on or in the soil, on or inside structures, or below the surface of the "covered location(s)" prior to the effective date of this policy, including "MEC loss" as a result of the explosion of the above-referenced "munitions and explosives of concern", that an "insured" is legally

16

> obligated to pay as a result of a "claim" first made against
> an "insured" during the "policy period", provided that the
> "insured" reports the "claim" to us, in writing, during the
> "policy period", or any applicable extended reporting
> period.

(R4, tab W at 1, 2 of 15)[10]  The policy also included section IV, "EXCLUSIONS," A through HH (*id.* at 6-9 of 15).

*Due Diligence, Boundary Survey & Security Gate*

37. The parties stipulated to the following: "Appellant procured the services of professional engineers to review the explosive conditions of the Property and related documentation and corrective action plan" (stip. ¶ 34).  This is referred to as the "Due Diligence" contract.  The Due Diligence contract with CH2M HILL, Inc., is attached to a 7 March 2013 letter from RRDA to the Army (R4, tab 7).  The contract with CH2M HILL was signed on 8 November 2004 (R4, tab 7 at 108), and is a time-and-material contract with a not-to-exceed amount of $50,000 (R4, tab 7 at 104, 110).

38. In April 2005 RRDA procured a boundary survey for a portion of the property known as parcel D2 (stip. ¶ 28).

39. On 10 January 2012 RRDA submitted its annual income and expenses for the period 1 January 2005 through 31 December 2005 (stip. ¶ 55).[11]  On 7 February 2013 the Army sent its reconciliation of income and expenses under the Master Lease for the period 1 January through 31 December 2005.  The reconciliation "disallowed" the following costs:

| | |
|---|---|
| (1.a.) Due Diligence | $10,036.00 |
| (2.a.) Parcel Boundary Surveys | $840.00 |
| (3.a.) Frontage Road & Utilities | $5,147.00 |
| (4.a.) Frontage Road & Utilities | $14,500.00 |
| Environmental Liability Insurance | $1,019,875.00 |
| Environmental Insurance Broker Fee | $129,350.00 |

(R4, tab 6)

40. By letter dated 7 March 2013, RRDA responded to the Army's denial of expenses stating:

---

[10]  The main policy is the last 15 pages of Rule 4, tab W.

[11]  We do not know why the "annual" submission in 2012 is for the year 2005, but it is supported by the record (R4, tab 6).

17

1.a.  Due Diligence - $10,036.00; this is a continuation of expenses related to a contract that was carried over from and approved in 2004.  The purpose of this expense was to insure RRDA's compliance with regulations concerning existing explosive manufacturing and storage operations located on Army owned property.  See the attached general ledger and associated contract marked Attachment 1.A.

2.a.  Parcel Boundary Survey - $840.00; this survey expense was required to correct the property line description on the pending transfer of Parcel D2.  See attached general ledger marked as Attachment 2.A.

3.a.  Frontage Road & Util - $5,147.00; this expense is related to the relocation of the security gate.  See attached general ledger marked as Attachment 3.A.

4.a.  Frontage Road & Utility - $14,500.00; this expense was necessary to insure proper operation and lighting of the security gate.  This amount also included $2,000.00 for security/crisis management training for the proper supervision of security operations associated with Army owned property.  See attached general ledger marked as Attachment 4.A.

(*Id.* at 96)  The attached general ledger entry for the period 1 January 2005 to 31 December 2005 for "Due Diligence" indicated a debit amount of $38,918.83, a credit amount of $28,883.20, and a balance of $10,035.63 (*id.* at 98).  The claimed $10,036 is simply the balance rounded up.  Also attached to the letter are copies of checks from RRDA to CH2M HILL for $36,512.72, dated 18 January 2005; and $2,406.11, dated 21 March 2005, that total $38,918.83 (*id.* at 99, 102).  The general ledger for "Parcel Boundary Surveys" shows the $840.00 (*id.* at 113), and the invoice for that amount has a handwritten entry, "South of Fairgrounds – Preparation to convey to RRDA eventually – cleared up property line question" (*id.* at 114).  The general ledger entry for: "Frontage Rd. & Util Imp" shows $5,147.30 but it is one of four entries totaling $26,554.30 that appear to be associated with the security gate relocation.  There is no credit amount for this activity.  (*Id.* at 116)  In the letter, RRDA requested that the Army reconsider its disallowance of appellant's 2005 expenditures under the Master Lease and requested a contracting officer's final decision as contemplated in the Contract Disputes Act applicable to the Master Lease and certified its claim for a credit of $1,179,748 against rental payments (stip. ¶ 57; R4, tab 7 at 97).

41. On 1 August 2013, the Army's contracting officer issued a contracting officer's final decision denying all but $2,000 of the expenditure amount, which $2,000 the Army agreed to deduct from "the amount owed as rent for 2005" and finding that the remaining expenditures "were not eligible for reimbursement to RRDA as a credit under the lease." (R4, tab 1 at 1, 9)

42. By letter dated 24 October 2013, RRDA filed a timely notice of appeal with the Board. On 25 October 2013, the Board docketed the appeal as ASBCA No. 58981.

## DECISION

*Contentions of the Parties*

The dispute over environmental insurance constitutes the majority of the dollar amount of RRDA's claim. RRDA argues that even though the indemnification clause may be unenforceable as a violation of the Anti Deficiency Act (ADA), since it was a basis of the bargain, the Army breached the contract when it reneged on the indemnification and refused to modify the contract to make alternative arrangements to ensure RRDA did not assume the risks previously covered by Condition 14.e.. The Army is therefore liable for the cost of insurance needed to replace the protections lost. As part of this argument RRDA argues it is entitled to equitable reformation, and that the Army breached its implied duty of good faith and fair dealing. RRDA also claims costs for environmental "due diligence" services, a parcel boundary survey, and the relocation of a security fence.

The Army counters that the insurance was unnecessary because it was already obligated to provide protection to RRDA by the MOA, Master Lease, O&M Plan, FTCA, CERCLA and ITCA. The Army reasons that is should not be liable for the cost of insurance that duplicated the protections already in place. The Army argues that RRDA is responsible for the costs of the environmental "due diligence" services, a parcel boundary survey, and the relocation of a security fence.

*RRDA's Environmental, Munitions and Explosives Liability Insurance*

*Indemnification Clause 14.e.*

We have found that during negotiations of the Master Lease, RRDA and the Army had a "meetings of the minds" that the Army would indemnify RRDA and included Condition 14.e. in the lease to provide for this situation (finding 25). The parties are in agreement that the Indemnification Clause was unenforceable as it violated the ADA (gov't reply br. at 10, attach. 2). We agree with the parties that the

19

Indemnification Clause is unenforceable.[12] Therefore, there is no need of the Board to discuss the ADA and the enforceability of the Indemnification Clause.

*Insurance Provisions of the Master Lease*

Since the majority of the amount claimed is for insurance costs, we first look at the specific provisions relating to insurance in the Master Lease to ascertain if the contract allows a credit of such costs towards rent. The first mention of insurance in the Master Lease is in Condition 3.g. where "taxes, insurance and common area maintenance are the Lessee's responsibility" and not to be offset from rent except for insurance "attributable" to tenants (finding 18). Condition 12, Insurance, subparagraph a. of the Master Lease required RRDA to purchase "comprehensive liability insurance" covering risks associated with appellant's operation on INAAP. Subparagraph f. excepts environmental protection from the comprehensive insurance and refers to Condition 21, CERCLA Remediation, Army Liability and Environmental Protection. (Finding 21)

RRDA argues that the insurance referred to in Condition 3.g. is not limited to "'comprehensive liability insurance' intended to protect against claims 'resulting from operations of the Lessee'" as is the insurance required in Condition 12 (app. br. at 49). It is true that the word "insurance" in Condition 3.g. is not qualified as in Condition 12. However, it is qualified by the requirement, "which are directly or indirectly (pro-rata share) attributable to the existing tenants" (finding 18). RRDA argues that it purchased environmental hazard insurance "to protect itself and the tenants"[13] from damages associated with "preexisting contamination during Appellant's operation of the Property" (app. br. at 51). RRDA then concludes, "The overwhelming benefit of the environmental insurance purchased by Appellant is attributable to existing tenants on the Property" (*id.*).[14] The Army counters with, "In order to be considered 'attributable to existing tenants,' the need for environmental insurance would have to be caused by existing tenants" (gov't reply br. at 28). We agree with the Army's interpretation. We do not see how the insurance purchased by RRDA benefits tenants. Even if it did, RRDA's interpretation that "benefit" is the equivalent of "attributable to existing tenants" is not within the "zone of reasonableness" and is not a reasonable second interpretation. *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1369 (Fed. Cir. 2009). Accordingly we

---

[12] "[A]bsent an express provision in an appropriation for reimbursement adequate to make such payment, [the ADA] proscribes indemnification on the grounds that it would constitute the obligation of funds not yet appropriated." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1299 (Fed. Cir. 2014) (quoting *Cal-Pac. Utils. Co. v. United States*, 194 Ct. Cl 703, 715 (1971)).

[13] We note that the tenants are not listed in the policy as the "insured" (supp. R4, tab W at 1 of 1).

[14] We agree with RRDA's argument that insurance does not require District Engineer approval as does "other offsets" in Condition 3.g. (app. br. at 49-51).

conclude that RRDA's environmental hazard insurance is not within the "existing tenants" exception in Condition 3.g. and therefore not allowed as an offset by Condition 3.f. (findings 17-18).

We interpret Condition 12.f., "Environmental protection is addressed in Condition No. 21, **CERCLA REMEDIATION, ARMY LIABILITY AND ENVIRONMENTAL PROTECTION**" to exclude environmental contamination from the mandatory insurance required by Condition 12.a. (finding 21). We interpret the fact that environmental liability is specifically excluded from Condition 12, Insurance, to mean that the Master Lease neither prohibits nor demands insurance to cover environmental contamination and is silent on the matter of environmental hazard insurance cost as an offset from the rent.

*Appellant's Argument*

RRDA argues that the ADA is not a bar to its recovery of environmental insurance costs as a credit against Fair Market Rent and in support of that argument cites several cases (app. br. at 28-35).[15] We have reviewed those cases and conclude that their facts are not analogous to the facts in the present appeal.

*Equitable Reformation*

The Federal Circuit has provided guidance on the availability of reformation:

> Reformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only upon presentation of satisfactory proof of four elements.
>
>> (1) the parties to the contract were mistaken in their belief regarding a fact;
>>
>> (2) that mistaken belief constituted a basic assumption underlying the contract;
>>
>> (3) the mistake had a material effect on the bargain; and

---

[15] *National Presto Industries, Inc. v. United States*, 167 Ct. Cl. 749 (1964); *RCS Enterprises v. United States*, 57 Fed. Cl. 590 (2003); *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181 (2012); *South Carolina Public Service Authority*, ASBCA No. 53701, 04-2 BCA ¶ 32,651.

(4) the contract did not put the risk of the mistake
on the party seeking reformation.

*National Australia Bank v. United States*, 452 F.3d 1321, 1329-30 (Fed. Cir. 2006).[16]
Proof of the elements required to support reformation must be proven by clear and
convincing evidence. *Id.*

RRDA argues that it is entitled to "equitable reformation" because the parties'
belief that INAAP was closed pursuant to a base closure law providing for
indemnification was mistaken, stating that "[a]t the time the Government and Appellant
executed the Master Lease both were mistaken in their belief that the Property was closed
pursuant to a base closure law" (app. br. at 46). This is an important point because the
success of RRDA's argument depends on there being a mistake of fact, not a mistake of
law. Reformation is not available if the mistake is one of law. *AECOM Government
Services, Inc.*, ASBCA No. 56861, 11-1 BCA ¶ 34,667 at 170,773 (post-award change in
tax law); *Safety Training Systems, Inc.*, ASBCA Nos. 57095, 57166, 14-1 BCA ¶ 35,509
at 174,054 (post-award increase in shipping costs). Mistakes of law cannot form the
basis for reformation:

> GD characterizes the alleged mistake as one of law,
> not fact, and views the issue as one that is ripe for decision.
> We agree with GD that the mistake alleged by the
> Government is one of law. In the absence of unusual
> circumstances, however, mistakes of law cannot form the
> basis for reformation. *T.L. Roof & Associates Constr. Co.
> v. United States*, 28 Fed. Cl. 572, 577 (1993). No unusual
> circumstances are present here and we find against the
> Government on its mutual mistake theory as a matter of
> law. [Citation omitted]

*General Dynamics Corp.*, ASBCA No. 49339, 97-2 BCA ¶ 29,167 at 145,030-31.

The record provides little to assist us in our consideration of the nature of the
mistake other than the language of the Master Lease. Based on that language, we
cannot accept RRDA's contention that the parties were "mistaken in their belief that
the Property was closed pursuant to a base closure law" (arguably a mistake of fact)
when the Master Lease itself clearly stated that it was authorized by Public Law

---

[16] Another Federal Circuit case cited in cases relied upon by RRDA adds another
basis for reformation, violation of a law or regulation intended to benefit
contractors. *LaBarge Products, Inc. v. West*, 46 F.3d 1547, 1550 (Fed. Cir.
1995). We need not discuss this line of cases because it is self-evident that the
ADA is not intended to benefit contractors.

22

No. 105-261, Section 2843, and not the base closure law (finding 14). This leads us to the conclusion that the alleged mistake was the Army's apparent belief it was authorized by the base closure law to include the indemnification, not that the INAAP was closed pursuant to base closure law. This is a mistake of law.

Additionally, it is RRDA's burden to prove the elements necessary for reformation. RRDA assumes, without discussion or analysis, that the mistake was a mistake of fact. We have found otherwise. RRDA failed to carry its burden, reformation is not available in this appeal.

*Duty of Good Faith and Fair Dealing*

Next RRDA argues that the Army breached the implied obligation of good faith and fair dealing. We agree such an obligation exists. The alleged breach was the Army's failure to "mitigate its invalidation of the Condition 14.e Indemnity and repeatedly refused Appellant's requests to renegotiate the terms of the Master Lease" (app. br. at 35). RRDA relies on Comptroller General decisions for the proposition that "the Government has a duty to take all reasonable steps to mitigate an ADA violation as soon as the violation is identified" (app. br. at 35). RRDA misconstrues what "mitigation" means in this context. In both decisions cited by appellant, 55 Comp. Gen. 768, B-132900 and B-223857,[17] the suggested mitigation was termination for the convenience of the government. Clearly the "mitigation" is ending the ADA violation not mitigating the effect of that action on the contractor as suggested by appellant.[18] The Army mitigated the ADA violation when it stated Condition 14.e. was illegal and would not be enforced. The Army did not violate its duty of good faith and fair dealing.

*FTCA, CERCLA and ITCA*

In response to RRDA's 27 August 2004 request for an amendment to the master lease to replace the protections afforded by the illegal indemnification (finding 31), the Army, in denying the request, took the position that RRDA was protected by the Federal Tort Claims Act (FTCA) and CERCLA (finding 32). On 1 November 2004, RRDA responded that while they "know the Army is liable for damages caused by the environmental conditions it created" they were "somewhat skeptical" that the Army would live up to its obligations (finding 33). We do not consider RRDA's being "skeptical" that the Army would live up to its obligations justifies granting RRDA an offset from the rent for insurance that duplicates the protection afforded by the Army.

In its brief, RRDA argues that the protections afforded by the FTCA, the CERCLA, and the Indiana Tort Claims Act (ITCA) do not provide comprehensive

---

[17] This decision does not have an associated Comp. Gen. cite.

[18] Appellant does not suggest that a termination for convenience is a remedy it seeks.

23

coverage as did the indemnification in Condition 14.e. (app. br. at 37). RRDA argues that limitations in the FTCA's protections exposes it to risk that would have been covered by the indemnification in Condition 14.e. (app. br. at 37-38). Similarly, RRDA argues that CERCLA is a limited waiver of sovereign immunity. RRDA seems particularly concerned that CERCLA does not impose any time constraints on the Army for remediation. (App. br. at 38-39) RRDA refers to the ITCA as a "red herring" and we tend to agree (app. br. at 39). Significantly, the Army agrees that these laws do not "provide the same protection from liability that an indemnification agreement would" (gov't reply br. at 14-15). The Army's position is that these laws "provide a broad range of protections, and that Appellant overstates the potential liability to which it is subjected without the protection of Condition 14.e. of the Master Lease" (*id.* at 15). RRDA argues that the difference in coverage that was lost justifies a credit for the entire insurance premium. RRDA argues, "the Government's indifference to Condition 14.e. of the Master Lease violates the fundamental principle of contract interpretation that contracts must be read to give meaning to all provisions and not render any provisions superfluous" (app. br. at 40) (citations omitted). We agree with this well-known tenet of contract interpretation. However, we also agree with the Army's reply, "principles of contract interpretation [do not] require meaning be given to otherwise illegal and unenforceable provisions" (gov't reply br. at 18). RRDA's argument seems to assume that the ADA violation is somehow irrelevant (app. br. at 28-35). We found above that Condition 14.e. was illegal and that the cases relied upon by RRDA to support its conclusion that the illegality did not matter in fact did not support that conclusion.

The important point we take from these arguments is that both parties agree that indemnification Condition 14.e. provided RRDA greater protection from environmental damage caused by the Army's activities on INAAP than it derives from the MOA, Master Lease, O&M Plan, FTCA, CERCLA and ITCA.

*The O&M Plan*

RRDA argues that its insurance premiums and broker's fee are authorized costs to perform the requirements of the contract's O&M Plan and should be allowed as an offset to rent under Condition 3.f. (app. br. at 41-45). It is correct that by Master Lease Condition 3.b. RRDA assumed responsibility for the O&M Plan and Condition 3.f. provided for a credit against rent for the costs of appellant's performance of the requirements of the O&M plan (findings 15, 17). RRDA points to Master Lease Condition 11, Protection of Property, and O&M Plan section E, Environmental, paragraph 2., INAAP RA Requirements, as the basis for its right to offset its environmental insurance costs (app. br. at 44). Condition 11 placed responsibility on RRDA for damage caused by RRDA or its sub-lessee's activities on INAAP (finding 20). The O&M Plan section E, paragraph 2.1., requires RRDA to "conduct an environmental program which shall include, but is not limited to, establishing, developing, and implementing policies, objectives, priorities, procedures, and assigning responsibility for

24

complying with an Environmental Quality Program which is designed to effectively and efficiently manage and control environmental pollution" (finding 30). Paragraph 2.2. requires RRDA to "establish plans in accordance with and comply with all applicable Federal, state, and local environmental laws, regulations, and executive orders" (*id.*). Paragraph 2.3. requires RRDA to "correct and/or respond to any violations or deficiencies cited and/or identified by" various state and Federal entities and be "responsible for the payment of any and all fines, penalties and costs resulting from actions or inactions by themselves and their tenants" (*id.*). These provisions are very broad and give RRDA great discretion to determine how best to fulfill its obligations under the O&M Plan. As we stated above, we find nothing in the Master Lease or O&M Plan either directing or prohibiting the purchase of environmental hazard insurance as part of RRDA's performance of its obligations under the O&M Plan. There is nothing in the Master Lease or O&M Plan that requires RRDA to self-insure. We see no reason why, given the broad discretion afforded to RRDA, that environmental hazard insurance cannot be part of its performance of the Master Lease and O&M Plan's requirements and therefore provide an offset to rent.

*Appellant's Environmental, Munitions and Explosives of Concern Liability Insurance Policy*

The insurance policy purchased by RRDA is a complicated document (R4, tab W at 1 of 15). For our purposes we need only understand that there are three general liabilities covered. Coverage A is for "FIRST PARTY" cleanup costs where the insured (RRDA) is "required by 'government authority'" to pay for cleanup resulting from a "pollution event" that is "first discovered by the 'insured' during the 'policy period.'" We understand this to cover contamination caused by RRDA and its tenants. Coverage B is for "THIRD PARTY POLLUTION LIABILITY" caused by a "pollution event" for which RRDA is "legally obligated to pay." Coverage C is for explosive loss liability for a loss RRDA is "legally obligated to pay." We understand Coverage B and C to cover contamination caused by the Army and its tenants. An extensive list of exceptions applies. (Finding 36)

*Protection Provided by the Army*

We next consider the protection provided by the Army in the MOA, Master Lease, O&M Plan, FTCA, CERCLA and ITCA. The MOA provided that the Army "shall remain responsible" for loss or damage resulting from Army "activities" prior to RRDA leasing INAAP (finding 6). The MOA required RRDA to indemnify the Army resulting from its "undertakings" under the MOA, however, "hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative" on the property prior to the lease were excluded from the indemnification (finding 7). The Army agreed to complete environmental cleanup as required by CERCLA and "other applicable laws" (finding 9). The Army provided a detailed Environmental Baseline Study detailing where environmental contamination was likely to exist (findings 10, 11). The "AS IS" and "WHERE IS" clause

25

excludes damage resulting from "an act or omission of the Lessor or an agent of the Lessor" (finding 19). The Protection of Property clause excludes damages caused by the "Lessor's activities" (finding 20). The hold harmless agreement in the Master Lease excludes liabilities resulting from Army negligence and from the Army's activities on the property for which the Army would otherwise be responsible (finding 22). The Army assumed responsibility for protecting human health and the environment from hazardous substances existing on the property as a result of the Army's or its contractor's prior use (finding 26). The O&M Plan required the Army to "seek funding to correct identified deficiencies" relating to environmental violations (finding 30). We conclude that through these provisions the Army provided RRDA significant protection from liability due to environmental contamination caused by the Army and its tenants.

*The Difference in Coverage between the Insurance and Army Protection*

We conclude that to the extent the insurance policy purchased by appellant covers cleanup of Army-caused contamination, it duplicates protection already provided by the Army in the MOA, Master Lease, O&M plan, FTCA, CERCLA and ITCA. We refer to this as "duplicate coverage." Recall that the parties have agreed that the indemnification clause, Condition 14.e., provided more protection to RRDA than the MOA, Master Lease, O&M Plan, FTCA, CERCLA and ITCA. Therefore, we conclude that the insurance covers more than this "duplicate coverage" for Army-caused contamination. The insurance also covers environmental contamination caused by RRDA and its tenants. Therefore, there is a "difference" in coverage between the "duplicate coverage" and the insurance coverage that does not duplicate the Army's protections. As stated above, RRDA purchased duplicate coverage based on speculation that the Army might not live up to its obligations and we do not consider this expense to be the Army's responsibility. However, we consider purchasing insurance for the "difference" to be within RRDA's discretion to implement the O&M Plan and is an expense it may offset against the rent.

We believe that this "difference" is a matter for quantum and competent evidence as to what portion of the insurance premiums and broker fee is attributable to the "difference." Since we are deciding only entitlement, we do not comment on this matter.

*Due Diligence Costs*

RRDA states, "Appellant submitted the cost of $10,036.00 to the Army for these environmental compliance services as credit against the Fair Market Rent" (app. br. at 23, ¶ 63). RRDA contends that it is entitled to offset the $10,036.00 because the study was a part of its performance of the O&M Plan section E, Environmental, paragraph 2., INAAP RA Requirements (app. br. at 51-52). The Army contends that since it is obligated to conduct remediation on the INAAP property it should not bear the cost of a study to

26

assess if the Army is complying with its own regulations or to assess if its remediation efforts are adequate (gov't br., argument § II.)[19]

On 8 November 2004, RRDA entered into a time and material contract with CH2M HILL to review the explosive conditions of the property. This is referred to as the "Due Diligence" contract. (Finding 37) RRDA claimed $10,036.00 as an offset to rent for due diligence work in 2005 but the Army disallowed the claim (finding 39). RRDA objected to the disallowance, asked for reconsideration and a final decision in a 7 March 2013 letter. In the letter, RRDA referred to the $10,036.00 as a "continuation of expenses related to a contract that was carried over from and approved in 2004." The general ledger attached to the letter, with copies of two checks, proves that RRDA paid CH2M HILL $38,918.83 for work on the contract. The general ledger indicated a credit amount of $28,883.20. The claimed $10,036.00 is the difference between the total paid of $38,918.83 and the credit amount of $28,883.20. (Finding 40)

None of these payments are mentioned by either party in their briefs or reply briefs. Neither party explained the meaning of the letter, the invoices, the checks, and most importantly the general ledger entries. Therefore, we must take the documents at face value and draw our conclusions as best we can. We conclude that the checks prove that CH2M HILL was paid $38,918.83. The $10,036.00 is the difference between the $38,918.83 paid and the $28,883.20 credit amount. What we do not know and cannot decipher is if the credit amount means that the Army allowed a credit against rent of $28,883.20 in 2004.

Keeping the above in mind, we apply the same interpretation of the Master Lease and O&M Plan to the "Due Diligence" claim as we did for the insurance costs. We found that Master Lease Condition 11, Protection of Property, and O&M Plan section E, Environmental, paragraph 2., INAAP RA Requirements "are very broad and give RRDA great discretion to determine how best to fulfill its obligations under the O&M Plan." Nothing in the Master Lease or O&M Plan limits RRDA's discretion to double check the Army's efforts at INAAP. Therefore, we agree with RRDA that the Due Diligence contract was within its discretion to determine how best to implement the O&M Plan and the costs are eligible to be offset against rent.

*Parcel Boundary Survey*

The parties stipulated that RRDA procured a parcel boundary survey in April 2005 (finding 38). The MOA states that RRDA shall pay for surveys "associated with the transfer/conveyance of The Property" (finding 5). RRDA's 7 March 2013 letter states that the "survey expense was required to correct the property line description on the pending transfer of Parcel D2" (finding 40). The invoice includes a handwritten

---

[19] The Army Rule 11 brief does not have page numbers.

comment that it was in "Preparation to convey"[20] (*id.*). RRDA characterizes the survey as "necessary for Appellant to meet its obligations under the Master Lease by ensuring that the costs of safety and security were separately allocated between the new Property boundaries, which were creditable against Fair Market Rent, and the conveyed property, which were the responsibility of Appellant" (app. br. at 53). On this rather meager record we agree with the government that RRDA "attempts to re-characterize a disposal expense as an O&M expense" (gov't reply br. at 33). RRDA is responsible for this expense and it may not be offset as a credit against the rent.

*Relocation of the Security Gate*

The Army disallowed $5,147.00 for relocation of a gate and $14,500 for electrical work associated with the relocation of the gate (finding 39). It is unclear why the general ledger for this work shows $26,554.30 whereas RRDA claims $17,647 ($5,147 + $12,500).[21] In any event, the relocation of the gate was apparently necessitated by the transfer to parcel D2. Since the gate is necessary to comply with the Master Lease and O&M Plan requirements to protect and secure the property (findings 20, 28, 29), we agree with RRDA that these costs are eligible to be a credit against the rent.

CONCLUSION

As discussed above, RRDA's appeals for the costs is sustained in part. The appeal is remanded to the parties to determine quantum in accordance with this opinion.

Dated: 22 March 2016

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[20] We found nothing in the record explaining this entry.
[21] Of the $14,500, $2,000 was allowed thus reducing the claimed amount to $12,500 (R4, tab 1 at 09).

I concur                                              I concur


MARK N. STEMPLER                                      RICHARD SHACKLEFORD
Administrative Judge                                  Administrative Judge
Acting Chairman                                       Vice Chairman
Armed Services Board                                  Armed Services Board
of Contract Appeals                                   of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58981, Appeal of River Ridge Development Authority, rendered in conformance with the Board's Charter.

Dated:


JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

29